1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10
11

BENJAMIN JUSTIN BROWNLEE,

No.  2:19-cv-02524 DJC AC

12

Petitioner,

13

v.

ORDER AND FINDINGS AND
RECOMMENDATIONS

14

JAMES HILL,[1]

15

Respondent.

16
17

Petitioner is a California state prisoner proceeding pro se with an application for a writ of

18

habeas corpus pursuant to 28 U.S.C. § 2254.  The petition challenges petitioner's 2017 conviction

19

for first degree murder and related offenses.  ECF No. 1.  Respondent has answered, ECF No. 13,

20

and petitioner did not file a traverse.

BACKGROUND

21

I.      Proceedings in the Trial Court

22

A.  Preliminary Proceedings

23
24

Petitioner was charged in Sacramento County case number 16FE018278 with robbery, sex

25

crimes, and murder.  Three special circumstances were alleged in relation to the murder: one for

26

[1] A federal petition for writ of habeas corpus must name as respondent the state officer having
custody of the petitioner.  See 28 U.S.C. § 2254; Rule 2(a) of the Rules Governing Section 2254

27

Cases in the United States District Courts; Smith v. Idaho, 392 F.3d 350, 354-55 (9th Cir. 2004).
Accordingly, James Hill, Warden of R.J. Donovan Correctional Facility (petitioner's current place

28

of incarceration, see ECF No. 33), is substituted as respondent herein.

1

murder in commission of robbery, and two for murder in commission of sex crimes (penetration of anus with an unknown object and penetration of genitals with an unknown object).  The case went to trial.

    B.  The Evidence Presented at Trial[2]

        1.  Prosecution Case

           a.  The Crimes

Sharen Brandow was a 69-year-old homeless woman.  Around 5:00 p.m. on August 1, 2016, J. R., a Good Samaritan, bought Brandow food and a drink and gave her the last of the cash in his pocket, including "[s]ome fives, tens and some ones."  Brandow had set up "camp" close to the sidewalk near the freeway overpass at Broadway and Alhambra Boulevard in Sacramento.  Brandow said she was going to sleep under the bridge where the streetlight hit her because she felt safe there.  She had been there for a couple of weeks.  When J. R. returned to Brandow's location the next morning around 7:30 or 8:00, he saw her up on the hill, face down and half clothed with her pants around her ankles.  He called a news station and 911.

An autopsy revealed that Brandow had suffered several injuries, including a broken jaw and multiple rib fractures, abrasions to various parts of her body, and injuries to her vagina and rectum caused by force from an unknown blunt object.  The injuries occurred at or near the same time and within less than 24 hours before her death.  Brandow died of asphyxiation due to strangulation with a potential "component of smothering and/or chest compression."

A one-dollar bill was found among the personal items on Brandow's body.  No useful DNA evidence was obtained from the vaginal, rectal, or oral swabs taken from Brandow or her clothing.

           b.  The Confession

L. M. met petitioner at work and allowed him to stay at her house for approximately three weeks in August 2016.  When she asked him to make new living arrangements, he was concerned about finding a place to stay.  He mentioned "he did something bad" -- he killed someone.  He

---

[2]  The following factual summary is adapted from the opinion of the California Court of Appeal, ECF No. 14-13 (Lodged Doc. 12).

explained it happened by the freeway off Broadway a month or two before and the victim was an older woman.  While he had remorse, petitioner said "when he gets to that point, that place, that

dark place . . . he can't control himself."  He said he was willing to speak with the police if L. M. supported him.

L. M. set out with petitioner for a police station, but pulled over on the way when she saw Sacramento Police Sergeant Dan Farnsworth on the side of the road.  Petitioner was arrested after he told Sergeant Farnsworth he had murdered a woman under the bridge on Alhambra Boulevard a couple of months prior.  While petitioner was seated in the patrol car, L. M. tried to comfort him.  Petitioner said it was best for him "to sit in jail" because he could not "function . . . out [t]here on the streets."  He believed it was "gonna get worse" for him because "when you go to jail, you never come out right.  You come out worse."  A video recording of this conversation was played for the jury.

Sacramento Detective Edward Macauley interviewed petitioner on September 18, 2016, and a video recording of the interview was played for the jury.  During the interview, petitioner said he believed he killed a person under the overpass on Broadway a couple of months prior. The attack occurred before the last light rail train departed from the Broadway station to 16th Street that evening.  He "choked the lady out" by the sidewalk where there was a dirt path underneath the overpass.  He "choked her out even when she was already not breathing [he] continued to choke her out."

Petitioner said that he has "blackout moments" due to posttraumatic stress disorder and having been "physically abused by people that's supposed to be the one that take care of you." He loses control when he is overwhelmed, and during those moments can become very violent and can hurt people who have nothing to do with his stress.  Brandow's attack was like "when [he] went to jail the first time" and the victim had to get facial reconstructive surgery.  He said: "Now it's [like] it came again but it took years for it to show up."

Petitioner explained he had previously been convicted of assault in the first degree in New York when he was 15 years old.  During that "episode," he punched and choked a lady and tried

3

to rob her.  Just prior to the attack, his grandmother had hit him on the back with a skillet and did not want him to go outside.  Instead of "swinging off on [his] grandmother," he went to an apartment building and tried to rob a lady.  "And next thing you know, [he] just got violent" and punched and choked her.

The triggering events for Brandow's attack were petitioner's own homelessness, medical problems, and an argument with his ex-girlfriend, T. W.  He saw Brandow while he was walking down the street following the argument with T. W, and "just flipped," "just snapped."  Petitioner had seen Brandow before because she was always in that area.

He left Brandow on the blanket or sheet where she was lying and took the light rail train to 16th Street, where he slept in an elevator.  He did not move her body, denied taking anything from her, and said he did not "know if she had been robbed."  He also denied inflicting any other injuries on her and said he was willing to submit a DNA sample.

Petitioner decided to confess because he felt an episode "coming on" and did not want another random person getting hurt.

> c.  <u>Other Evidence</u>

>> i.  <u>Petitioner's Hand Injury</u>

Petitioner went to a hospital emergency room on August 3, 2016, the day after Brandow's body was found and complained of pain in his right hand.  He had abrasions over his knuckles and generalized tenderness; the injury occurred within a couple of days prior to the examination.

>> ii.  <u>Petitioner's Possession of Brandow's Documents</u>

T. W. gave the police a black backpack she said belonged to petitioner.  She retrieved the backpack from the downstairs patio of her brother's house where petitioner had stayed at some point.  The backpack contained, among other things, a number of petitioner's documents and his prescription bottle, and also contained Brandow's senior citizen identification, social security card, Medicare card, and documents discussing her supplemental income from the Social Security Administration.  None of these documents had any latent fingerprints on them.

////

////

4

iii.     Evidence Regarding the 2005 New York Alleged Sexual Offense

The trial court allowed the prosecution to introduce testimony regarding a video of the sexual offense petitioner allegedly committed in New York in 2005 when he was convicted of assault.  E. B. testified she was attacked in 2005 while she was working in a building's laundry room.  She recalled a man with a cast asked her where the lobby was and later, when she left the laundry room, she was hit in the face multiple times.  She tried to fight and kick back but could not recall much else because she lost consciousness.  When she came to, E. B. noticed her pants were slightly lowered and there was a woman in the basement.  E. B. suffered injuries to her eye, nose, and teeth, and needed plastic surgery as a result.

Detective Josh Ulan investigated the assault.  Petitioner was 15 years old at the time of the attack and E. B. was 44 years old.  Petitioner admitted to assaulting E. B. by hitting her in the face several times.  Petitioner said he was interrupted by another woman coming to the laundry room and ran away.

A five-minute video showing petitioner's movements in the apartment building, his initial discussion with E. B., and the attack was played for the jury.  The video presented still frames rather than fluid playback.  The frames of the attack depicted the following sequence: E. B. on the ground on her right side with petitioner standing over her in a fighting stance with his right hand extended; E. B. face down with petitioner's right hand on her back and his left hand in her lower abdomen, groin area; petitioner rolling E. B. onto her right side; E. B. on her back and petitioner crouching over her with his right hand by her face; E. B. still on her back with both of petitioner's hands at her groin; petitioner squatting over E. B.'s legs appearing to pull backwards while his hands are at her groin; E. B.'s right leg in the air with petitioner's hands at her shoe; petitioner grabbing E. B.'s left leg by her ankle above the shoe, her other shoe a few feet behind her; petitioner pulling E. B.'s left leg back over her head with his right hand and grabbing the waist of her pants with his left hand, trying to pull them over her buttocks; petitioner flipping E. B. onto her stomach, her pants pulled down to her thighs with her buttocks exposed; E. B. sitting up, blood pouring from her face onto the ground, with petitioner not in the frame.

////

5

1    2.  Defense Case

2         Petitioner was the sole witness for the defense.  He testified that he did not kill Brandow.

3    He had confessed to her murder only because winter was coming and he knew he would have a

4    bed, food, companionship, and medical care in jail.  Petitioner intended to lie about the murder to

5    get through the winter and believed the evidence would then have proven him innocent.  He told

6    L. M. he committed murder because he did not believe the police would take a lesser crime

7    seriously.

8         When L. M. told petitioner he needed to find somewhere else to live, he felt down,

9    agitated, and stressed.  Petitioner did not have anywhere to go and did not have any money to find

10   a place to stay.  He never had money because he would spend it on medications and, if he had any

11   extra, he would drink alcohol and buy drugs.  He acknowledged that he told T. W. during a jail

12   visit that he "got to fuckin' rob and steal" to survive and had no choice but to "do credit card

13   swipes, fuckin' stealing people's wallets just to fuckin' eat, just to get a place so [he] can fucking

14   take a shower and sleep in a hotel for a couple hours."

15        The details in petitioner's confession came from his discussions with a man named "CC,"

16   who was introduced to him by T. W.'s sister.[3]  CC told petitioner that he choked a woman and

17   beat her in the head with a metal object.  CC said the incident occurred on Broadway by the

18   overpass. Petitioner was able to give details about the area, Brandow, and her clothing and

19   luggage because he had seen her there in the past.

20        Petitioner said the injury to his right hand occurred during a fistfight with individuals from

21   a street gang.  He further testified he did not recognize the black backpack T. W. gave to police

22   and never touched any of Brandow's documents.  He never left anything at T. W.'s brother's

23   house either.

24        Regarding the New York offense, petitioner testified his intent that day was "[j]ust to rob

25   people."  He went to the laundry because he knew the machines took quarters and there was a

26   machine that turned dollars into quarters.  He saw E. B. and decided to rob her because one of her

27

28   [3] T. W. testified that her sister knew a man named "CC," but T. W. did not know him and he was
     not her brother's friend, nor had he been to her brother's house.

6

pockets was "bulging out."  He usually did not demand property from people; "[he] usually just tr[ied] to knock the person out and then take their money and run off."  He hit E. B. with his cast and was trying to get into her pockets when she started kicking.  Her pants came off because his hands were trying to get into the little pockets on her pants to get the money out.  Petitioner was unable to get the money because he was interrupted and ran off.

C.  Outcome

The jury found petitioner guilty of first-degree murder and found true the robbery special-circumstance allegation. The jury also found petitioner guilty of second-degree robbery. Petitioner was found not guilty of the charged sex crimes, and the sex-crime-murder special-circumstance allegations were not found not true.

Petitioner was sentenced to life without the possibility of parole.

II.    Post-Conviction Proceedings

Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of conviction on April 16, 2019.  Lodged Doc. 12 (ECF No. 14-13).  The California Supreme Court denied review on July 24, 2019.  Lodged Doc. 14 (ECF No. 14-15).

Petitioner filed no applications for state collateral relief.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons.  Harrington v. Richter, 562 U.S. 86, 99

7

(2011).  State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary.  Id. (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  Id. at 99-100.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).  Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent."  Marshall v. Rodgers, 569 U.S. 58, 64 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529 U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court.  Cullen v. Pinholster, 563 U.S. 170, 180-181 (2011).  The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it.  Id. at 181-182.  In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did."  Id. at 182.  Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc).  A different rule applies where the state court rejects claims summarily, without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court

1  must determine what arguments or theories may have supported the state court's decision, and

2  subject those arguments or theories to § 2254(d) scrutiny.  Richter, 562 U.S. at 102.

3  <center>DISCUSSION</center>

4  I.   Claim One: Insufficient Evidence to Support Robbery Conviction

5       A.   Petitioner's Allegations and Pertinent State Court Record

6       Petitioner alleges that the evidence at trial, which has been summarized above, was

7  insufficient to support an inference that he had the intent to rob Brandow either before or during

8  the use of force that resulted in her death.  Accordingly, he contends that the robbery conviction

9  and special circumstance cannot stand.

10       B.   The Clearly Established Federal Law

11       Due process requires that each essential element of a criminal offense be proven beyond a

12  reasonable doubt.  United States v. Winship, 397 U.S. 358, 364 (1970).  In reviewing the

13  sufficiency of evidence to support a conviction, the question is "whether, viewing the evidence in

14  the light most favorable to the prosecution, any rational trier of fact could have found the essential

15  elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319

16  (1974).  If the evidence supports conflicting inferences, the reviewing court must presume "that

17  the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer

18  to that resolution."  Id. at 326.  "A reviewing court may set aside the jury's verdict on the ground

19  of insufficient evidence only if no rational trier of fact could have agreed with the jury."  Cavazos

20  v. Smith, 565 U.S. 1, 2 (2011).

21       C.  The State Court's Ruling

22       This claim was raised on direct appeal.  Because the California Supreme Court denied

23  discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned

24  decision on the merits and is the subject of habeas review in this court.  See Ylst v. Nunnemaker,

25  501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

26       The state appellate court ruled as follows:

27           Defendant argues there was insufficient evidence to support the
             robbery conviction because there was no evidence from which the
28           jury could infer defendant had the intent to rob Brandow before or

<center>9</center>

during the act of force. It follows, he argues, that because the predicate robbery conviction must be reversed, the robbery special circumstance finding and the "robbery-felony murder" conviction must be reversed as well. [fn: The jury was instructed with two theories for first degree murder -- felony murder and premeditated and deliberate murder.]  We find the evidence sufficient to support the robbery conviction.

"In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence -- evidence that is reasonable, credible and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] We do not reweigh evidence or reevaluate a witness's credibility." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129.)

Defendant posits *Marshall* supports his argument. (*People v. Marshall* (1997) 15 Cal.4th 1.) In *Marshall*, the defendant was charged with, among other things, murder and robbery. (*Id.* at p. 11.) The only property the defendant took from the victim was a letter from a grocery store to the victim responding to her request for a check-cashing card. (*Id.* at p. 34.) Our Supreme Court found no evidence the defendant exerted force against the victim or killed her to obtain the letter. (*Ibid.*)

Our Supreme Court explained that robbery is "the taking of personal property of some value, however slight, from a person or the person's immediate presence by means of force or fear, with the intent to permanently deprive the person of the property. [Citations.] To support a robbery conviction, the evidence must show that the requisite intent to steal arose either before or during the commission of the act of force. [Citation.] '[I]f the intent arose only after the use of force against the victim, the taking will at most constitute a theft.' [Citation.] The wrongful intent and the act of force or fear 'must concur in the sense that the act must be motivated by the intent.' " (*People v. Marshall, supra*, 15 Cal.4th at p. 34.)

The defendant's possession of the victim's letter did not constitute evidence that " 'reasonably inspires confidence' " that the defendant killed her for the purpose of obtaining the letter because it was, "in the prosecutor's words, an 'insignificant piece of paper' " and the prosecution offered no evidence tending to show the information was "so valuable to defendant that he would be willing to commit murder to obtain it." (*People v. Marshall, supra*, 15 Cal.4th at p. 35.) Therefore, the court concluded there was

insufficient evidence to support the robbery conviction. (*Ibid.*)

Defendant argues Brandow's documents found in the black backpack were items of "no inherent value" like the letter in *Marshall* and there was no evidence or argument from which the jury could infer an intent to exert force for the purpose of obtaining the documents. We disagree with defendant that Brandow's documents had "no inherent value." Personal identifying information, financial information, and medical information have value and are often stolen for criminal purposes; indeed, that is why society seeks to protect personal information from prying eyes and hands. We also read the record quite differently. Brandow's documents were not the only evidence from which the jury could infer defendant's intent to steal arose before or during the commission of the act of force that resulted in her death.

The record shows the jury could have inferred defendant's requisite intent from several other additional facts taken together, such as: (1) his own testimony that once he forms the intent to rob someone, he uses violence as a means to subdue the person to carry out the robbery -- and Brandow suffered many violent injuries, including a fractured jaw and multiple rib fractures; (2) defendant's analogy to Detective Macauley regarding the Brandow attack and the New York offense and defendant's subsequent testimony that the New York attack arose from his intent to rob E. B.; (3) defendant's statements to T. W. during a jail visit that he had to rob and steal to survive on the streets; (4) defendant's testimony that he did not have any money to find a place to stay; (5) the temporal proximity between defendant's stress about needing money to find a new place to stay and the attack on Brandow; and (6) there were only a few hours between Brandow receiving "some fives, tens and some ones" (after she set up "camp" after 5:00 p.m.) and when defendant confessed to choking her (before the last light rail train ran from Broadway to 16th Street that evening) but only a one-dollar bill was found on Brandow's person the next morning.

Viewing the evidence in the light most favorable to the verdict, we conclude a reasonable trier of fact could find -- and did -- that the essential elements of robbery had been met beyond a reasonable doubt. (*See People v. Carter* (2005) 36 Cal.4th 1215, 1260-1261 ["The requisite intent for each crime, and supporting each of these special circumstances, readily may be inferred from the evidence"].)

Lodged Doc. 12 (ECF No. 14-13) at 15-17.

D.  Objective Reasonableness Under § 2254(d)

The California Court of Appeal applied the standard required by Jackson v. Virginia, supra, and explained its reasoning with reference to the evidence presented at trial.  Nothing about the court's analysis is objectively unreasonable.  Because there was evidence to support an inference that petitioner intended to rob the victim, clearly established federal law obligated the

11

1   state court to defer to the jury's conclusion on that issue.  See Jackson, 443 U.S. at 326.  That the

2   evidence did not necessarily compel the jury's conclusions does not render them constitutionally

3   infirm.  This is far from a case in which "no rational trier of fact could have agreed with the jury."

4   Cavazos, 565 U.S. at 2.  Particularly in light of the "double dose of deference" to the verdict that

5   is required under the Due Process Clause and the AEDPA, Boyer v. Belleque, 659 F.3d 957, 964

6   (9th Cir. 2011), federal habeas relief is unavailable on this claim.

7       II.     Claim Two: The Trial Court Failed to Instruct the Jury that the Robbery Special

8               Circumstance Required Proof that the Robbery Was Independent of the Homicide

9                   A.  Petitioner's Allegations and Pertinent State Court Record

10          Petitioner alleges that the trial court erred in failing to sua sponte instruct the jury that in

11  order to find the special circumstance true, it must find that petitioner intended to commit the

12  underlying felony independent of the killing.  Petitioner contends that the instructional error

13  violated his "rights under the Fifth, Sixth and Fourteenth Amendments to have the jury instructed

14  on all of the elements of the charges against him."  ECF No. 1 at 51.

15          The jury was instructed pursuant to CALCRIM 730, as follows:

16              The defendant is charged with the special circumstance of murder
                committed while engaged in the commission of […] Robbery.
17

18              To prove that this special circumstance is true, the People must
                prove that:

19              1. The defendant committed […] Robbery.

20              2. The defendant intended to commit […] Robbery;

21              AND

22              3. The defendant did an act that caused the death of another person.

23              To decide whether the defendant committed […] Robbery, please
                refer to the separate instructions that I have given you on that crime.
24              You must apply those instructions when you decide whether the
                People have proved first degree murder under a theory of felony
25              murder.

26              The defendant must have intended to commit […] Robbery before
                or at the time of the act causing the death.
27

28  2 CT 330 (ECF No. 14-3 at 31); see also 2 RT 574-575 (ECF No. 14-6 at 278-279).

The court omitted the following bracketed, optional language in CALCRIM 730:

> In addition, in order for this special circumstance to be true, the People must prove that the defendant intended to commit [robbery] independent of the killing. If you find that the defendant only intended to commit murder and the commission of [robbery] was merely part of or incidental to the commission of that murder, then the special circumstance has not been proved.

CALCRIM 730.

### B. The Clearly Established Federal Law

As a general matter, errors in instructing the jury implicate a defendant's constitutional rights only if they "so infect[] the entire trial that the resulting conviction violates due process." Estelle v. McGuire, 502 U.S. 62, 71 (1991). Alleged instructional error "must be considered in the context of the instructions as a whole and the trial record." Id. at 72. In challenging the failure to give an instruction, a habeas petitioner faces an "especially heavy" burden because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

### C. The State Court's Ruling

This claim was exhausted on direct appeal, and the opinion of the California Court of Appeal is therefore the proper subject of federal habeas review. Ortiz, 704 F.3d at 1034. The appellate court ruled as follows:

> A person found guilty of first degree murder may be sentenced to death or to prison for life without the possibility of parole if, among other things, the jury finds true the special circumstance that the murder was committed while the defendant was engaged in the commission of a robbery. (Pen. Code, § 190.2, subd. (a)(17)(A).) The trial court instructed the jury that the robbery-murder special circumstance was true if defendant committed the murder in the course of a robbery such that (1) defendant committed robbery, (2) defendant intended to commit robbery, and (3) while committing the robbery, defendant did an act that caused the death of another. The court also instructed the jury that defendant must have intended to commit the robbery before or at the time of the act causing the death.
>
> Defendant argues the trial court failed to "instruct sua sponte that, in order to find the [robbery] special circumstance true, the jury [had to] find that the defendant intended to commit the felony independent of the killing, and that if the felony [was] incidental to an intended murder, then the special circumstance was not true." He relies on our Supreme Court's decision in *Green* and the bracketed optional language in CALCRIM No. 730. We disagree.

13

In *Green*, the defendant instructed the victim to remove her clothing before shooting her. (*People v. Green* (1980) 27 Cal.3d 1, 15-16.) After the shooting, the defendant took the victim's rings and purse, and removed cash from her purse. (*Id.* at p. 16.) The victim's belongings were later burned or disposed of to avoid identification. (*Id.* at pp. 17, 61-62.) Our Supreme Court concluded that whether the items were taken before or after the victim was killed was of little relevance when the defendant's primary objective was to remove items from the victim to prevent her subsequent identification. (*Id.* at p. 62.) Under those circumstances, because "defendant's intent [wa]s not to steal but to kill and the robbery [wa]s merely incidental to the murder," there was insufficient evidence as a matter of law to support the jury's finding of the truth of the robbery special circumstance. (*Id.* at pp. 61-62.)

Our Supreme Court subsequently clarified the impact of *Green* with regard to the special-circumstance instruction. In *Monterroso*, the court said: "We subsequently held, however, that inasmuch as *Green* did not announce a new element of the special circumstance allegation but had merely clarified the scope of an existing element, a trial court had no sua sponte duty to provide a clarifying instruction in the absence of evidence to support a finding that the felony was in fact merely incidental to the murder. [Citation.] Thus, unless the evidence supports an inference that the defendant might have intended to murder the victim without having an independent intent to commit the specified felony, there is no duty to include" the bracketed language. (*People v. Monterroso* (2004) 34 Cal.4th 743, 767.)

In summary, the special circumstance applies only if the robbery was the primary crime rather than incidental to the murder; a robbery is incidental when the "sole object" of the robbery "is to facilitate or conceal" the murder. (*People v. Green, supra,* 27 Cal.3d at p. 61.) "That is, if the murder furthers the robbery or attempted robbery, the special circumstance is satisfied. But, if the robbery or attempted robbery simply furthers or facilitates the murder, it is not, because the robbery's 'sole object is to facilitate or conceal the primary crime.' " (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 490- 491.) A trial court is required to instruct the jury on the requirement that the robbery not be incidental, however, only " 'where the evidence suggests' " -- that is, when "the evidence supports an inference" -- that the robbery was " 'merely incidental to achieving the murder.' " (*People v. D'Arcy* (2010) 48 Cal.4th 257, 296-297; *see People v. Monterroso, supra,* 34 Cal.4th at p. 767.)

It is true, as defendant contends, that the record contains evidence defendant "had engaged in violent behavior as a misplaced reaction to other stressors in his life." As discussed below, such evidence alone does not, however, suggest that the robbery was merely incidental to achieving the murder. In *Navarette*, the defendant argued the trial court erred in failing to instruct the jury with "incidental" language similar to that defendant asserts was missing in the CALCRIM No. 730 instruction. (*People v. Navarette* (2003) 30 Cal.4th 458, 505.) Our Supreme Court explained: "[T]he record

14

includes no significant evidence of any motive for the murders other than burglary and/or robbery. Defendant asserts, based on 'the multitude of stab wounds,' that the killings might have been an explosive 'unleashing of some type of unconscious hatred for women,' having nothing to do with robbery or burglary. But the record does not include any evidence (other than the brutality of the crimes) that defendant had an unconscious hatred for women, and defendant did nothing to develop this theory of the case at trial, making only a passing speculative reference to this theory at closing argument. Defendant's primary defense at trial was that he was too intoxicated to act with intent. Under the circumstances of the case as presented to the jury, [the incidental language] was not required." (*Ibid.*)

The only evidence [fn. omitted] regarding defendant's "misplaced reaction to other stressors in his life" was his confession and his statement to L. M. Defendant did not develop "this theory of the case at trial." (*People v. Navarette, supra*, 30 Cal.4th at p. 505.) In fact, defendant vehemently refuted it. During his trial testimony, defendant said the statements made in his confession and to L. M. were untrue. He denied having attacked Brandow and said he attacked E. B. with the intent to rob her (not as a misplaced reaction to other stressors). As defendant's counsel appropriately pointed out in closing argument: "The prosecution in arguing its opening statement talked about a psychological profile that was unsupported by the evidence. There was no psychiatrist, psychologist, licensed clinical social worker or any other mental health professional, no F.B.I. profiler, not vi-cap agent to claim that [defendant] suffers from this cyclical buildup of aggression, release, violence towards older women. There is no evidence to support that diagnosis." "Under the circumstances of the case as presented to the jury, [the incidental language] was not required." (*Navarette*, at p. 505.)

This is not a case in which there was evidence from which the jury could infer defendant took the property to forestall identification of the victim (*People v. Green, supra*, 27 Cal.3d at pp. 61-62), as a remembrance of the murder or sexual offense (*People v. Marshall, supra*, 15 Cal.4th at p. 41), or where the taking of the property was for the sole purpose of killing Brandow (*People v. Brooks* (2017) 3 Cal.5th 1, 118 [jury could have inferred kidnapping was for the sole purpose of killing the victim]). "For those who kill . . . we need not discern their various mental states in too fine a fashion; a 'concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance.' " (*People v. Abeles* (2007) 41 Cal.4th 472, 511.) Here, there was substantial evidence, as discussed ante, that defendant had a concurrent intent to commit the robbery.

The trial court, therefore, was not required to include the bracketed language in the CALCRIM No. 730 instruction. Since it properly could have been omitted, defendant suffered no prejudice from any purported error in that portion of the instruction. (*People v. Monterroso, supra*, 34 Cal.4th at p. 767.)

Lodged Doc. 12 (ECF No. 14-13 at 17-21.

15

1    D.  Objective Reasonableness Under § 2254(d)

2          The California Court of Appeal's rulings on matters of state law—including the elements

3    of felony murder and special circumstances liability—are unreviewable here.  See Bradshaw v.

4    Richey, 546 U.S. 74, 76 (2005) (federal habeas court is bound by state court's interpretation of

5    state law).  Accordingly, this court must accept the appellate court's express determinations that

6    the state of the evidence in this case did not support the instruction that petitioner urges, and that

7    omission of the additional language did not amount to a failure to instruct on an essential element

8    of the special circumstance.  This finding undermines petitioner's theory of constitutional error.

9          In Menendez v. Terhune, 422 F.3d 1012 (9th Cir. 2005), the Ninth Circuit rejected a claim

10   of constitutional error in the trial court's failure to instruct on imperfect self-defense.[4]  Under

11   California law, that instruction is appropriate only when warranted by the evidence.  Because the

12   state trial and appellate courts found the instruction unwarranted as a matter of state law, the

13   Ninth Circuit found first that the alleged error did not provide a cognizable basis for federal

14   habeas relief.  Menendez, 422 F.3d at 1029 (citing Estelle, 502 U.S. at 67-68).[5]  The Court of

15   Appeals went on to explain that even if the jury instruction had been appropriate as a matter of

16   state law, failure to give it would not, without more, merit federal habeas relief.  Id. (citing Miller

17   v. Stagner, 757 F.2d 988, 993 (9th Cir. 1985)).  As the U.S. Supreme Court has said, "a claim that

18   a court violated a petitioner's due process rights by omitting an instruction requires a showing

19   that the error 'so infected the entire trial that the resulting conviction violated due process.'"  Id.

20   (citing Henderson, 431 U.S. at 154 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  The

21   Ninth Circuit found no such fundamental unfairness in the failure to give the requested

22   instruction.  Id. at 1030.

23          The same result is compelled here.  The state courts' rulings on the inappropriateness of

24   the instruction are binding interpretations of California law.  And there was no fundamental

---

25   [4]  In this highly publicized case, brothers Erik and Lyle Menendez were tried for the murder of
26   their parents.  They claimed at trial that the killings were the result of years of physical, sexual,
     and psychological abuse, and thus not murder, but only manslaughter.

27   [5]  The undersigned notes that the evidence presented in support of the requested instruction in
     Menendez was significantly stronger than the factual basis for the additional instruction urged
28   here.

16

1   unfairness.  Because there was no evidence in this case to suggest that the robbery was "incidental

2   to achieving the murder," <u>People v. D'Arcy</u>, 48 Cal.4th 257, 296-297 (2010), the optional portion

3   of CALCRIM 730 simply did not apply and the failure to give it cannot have so infected the trial

4   with unfairness as to violate due process.

5       III.    <u>Claim Three: Admission of Prejudicial Evidence Regarding Prior Alleged Sex Offense</u>

6           A.  <u>Petitioner's Allegations and Pertinent State Court Record</u>

7       Petitioner alleges that he was prejudiced, in violation of due process, by admission of the

8   New York alleged sexual offense evidence summarized above at pages 4-5 of these Findings and

9   Recommendations.  The pertinent portion of the trial court record is as follows.

10      The prosecution moved in limine to admit evidence of the 2005 New York incident under

11  Cal. Evid. Code section 1108.[6]   1 CT 162-172 (ECF No. 14-2 at 138-148).  The defense moved

12  to exclude the evidence.  1 CT 135-148 (ECF No. 14-2 at 111-124).  The prosecutor informed the

13  judge that petitioner had entered a plea of guilty to robbery in that case.  1 RT 27 (ECF No. 14-5

14  at 31).  Petitioner asked the judge to review the video of the incident, arguing it was not a sexual

15  offense and was therefore not admissible under section 1108.  Petitioner argued in the alternative

16  that even if the evidence suggested some degree of sexual conduct, the incident was not relevant

17  to his state of mind as to Ms. Brandow because the New York offense was committed when he

18  was a juvenile.  Petitioner also argued that the offense was too remote in time because it had

19  occurred approximately 11 years prior.  <u>See</u> 1 RT 28-30 (ECF No. 14-5 at 32-34).

20      After reviewing the video, the trial judge said: "But the way I'm -- the way I viewed the

21  video is that she's on her back and I can't tell if she's conscious or not at that point, there's no

---

[6]  Cal. Code Evid. Section 1101(a) generally renders inadmissible "evidence of a
person's character or a trait of his or her character (whether in the form of an opinion,
evidence of reputation, or evidence of specific instances of his or her conduct) . . . when
offered to prove his or her conduct on a specified occasion."  Section 1108 relaxes that standard
in sex offense cases.  In such cases, "evidence of the defendant's commission of
another sexual offense or offenses is not made inadmissible by Section 1101, if the
evidence is not inadmissible pursuant to Section 352."  Under section 1108, propensity evidence
in sex offense cases is not considered unduly prejudicial per se.  <u>People v. Falsetta</u>, 21 Cal.4th
903, 916-917 (1999).  Courts are required to weigh probative value against prejudicial impact in
deciding whether to permit such evidence in a particular case.  <u>Id.</u>; Cal. Evid. Code § 352.

way to tell because there's no audio, but I can see him holding her foot and then her shoe's off in the next frame and then he pulled down her pants.  It doesn't look like his hands are in any position looking for money.  He's holding her feet up so he can get her pants off is what it appears."  1 RT 46-47 (ECF No. 14-5 at 50-51).  The judge added: "I would note that the pants were pulled down well beyond what would be possibly accidental to search them.  They're pulled down mid thigh, not just a few inches. And he did turn her over after he pulled down her pants as if to mount her."  1 RT 51 (ECF No. 14-5 at 55).

The judge found the evidence persuasive that petitioner intended to commit a sexual assault, making it potentially admissible as § 1108 evidence.  Id.  While the judge acknowledged that the offense was remote in terms of petitioner's age, he noted that petitioner had not been out of custody for very long when the attack on Brandow occurred.  He also found the fact pattern in petitioner's case suggested he was not a very different person as a juvenile than when he was charged as an adult.  Accordingly, the judge rejected petitioner's remoteness and state of mind arguments.  1 RT 30-31 (ECF No. 14-5 at 35-36).

Petitioner later made another objection to the evidence under section 352, arguing the testimony and video would result in an undue consumption of time and would place unnecessary attention on the prior alleged sexual offense, confusing the jury.  He further argued "[t]he nature of the evidence [wa]s so inherently inflammatory and it would take so long compared to the other evidence in the case" that "it would become extremely prejudicial."  1 RT 92 (ECF No. 14-5 at 94).  The trial judge asked the prosecution whether it had considered alternatives to playing the entire video.  The prosecution responded the video could be edited to about two minutes and the victim's testimony was estimated to take approximately 10 minutes.  1 RT 93-94 (ECF No. 14-5 at 95-96).

Addressing the prosecution, the trial judge said: "Let me make this clear. I would agree that it is highly probative.  The prejudicial value is far outweighed by the probative value in this case; however, having said that, what I don't want to do is consume an undue amount of time when it could otherwise be condensed.  So I am not asking you to redact anything that is probative.  What I do want to do is redact anything that's not probative."  Turning to petitioner,

1    the trial judge said: "With that, your objection is noted . . . and overruled in large degree and

2    granted in some degree in that the Court is admonishing the prosecutor to redact anything that is

3    unnecessary so as to avoid undue time and focus on the prior when the evidentiary value of that is

4    slight or nil."  1 RT 95-96.

5         During trial, the parties attempted to reach a stipulation as to Detective Ulan's proposed

6    testimony but failed to do so.  Petitioner argued his testimony in addition to the victim's

7    testimony and the video depicting the attack would tip "the scales of the 352 test out of balance"

8    and likely result in an unfair trial.  The prosecution disagreed – arguing that the total amount of

9    time to be spent on the prior alleged offense was minimal and would not prejudice petitioner.

10   The trial judge agreed with the prosecution.  2 RT 329-332 (ECF No. 14-6 at 33-36)

11        The trial judge said: "As I weigh the elements of 352 and I consider the appropriate value

12   of this, I don't believe that it paints the defendant in an unfair light or creates an inherent

13   unfairness.  The consumption of time is not beyond the pale.  It is consistent with the level of

14   weight that the jury is going to put on that evidence to show his intent and predisposition in this

15   case, which is allowable for that purpose. [¶]  So, I don't find that it's an undue consumption of

16   time." 2 RT 331-332 (ECF No. 14-6 at 35-36).

17                        B.  The Clearly Established Federal Law

18        In general, rulings on the admissibility of evidence are matters of state law and therefore

19   cannot support federal habeas relief.  Estelle v. McGuire, 502 U.S. 62, 67 (1991).  An erroneous

20   evidentiary ruling violates due process only when it results in the denial of a fundamentally fair

21   trial.  Id. at 72.  The Supreme Court has expressly rejected the argument that due process

22   necessarily requires the exclusion of prejudicial or unreliable evidence.  See Spencer v. Texas,

23   385 U.S. 554, 563-564 (1967); Perry v. New Hampshire, 565 U.S. 228, 245 (2012).

24                        C.  The State Court's Ruling

25        This claim was exhausted on direct appeal, and the opinion of the California Court of

26   Appeal is therefore the proper subject of federal habeas review.  Ortiz, 704 F.3d at 1034.  The

27   state court ruled as follows:

28   ////

Section 1108, subdivision (d)(1)(B) defines "sexual offense" to include "[a]ny conduct proscribed by Section 220 of the Penal Code, except assault with intent to commit mayhem." Penal Code section 220, subdivision (a)(1), prohibits any person from assaulting another with the intent to commit rape or sodomy. The trial court's summary of the video accurately depicted the scene of the New York incident, and we agree it was persuasive to show defendant intended to commit rape or sodomy. We, therefore, conclude the prior alleged conduct was appropriately labeled a sexual offense for purposes of admissibility under section 1108. We also conclude the trial court did not abuse its discretion under section 352.

Defendant challenges the trial court's section 352 ruling on three grounds: (1) lack of probative value; (2) remoteness; and (3) undue prejudice. First, defendant argues the alleged conduct "lacked probative value" because it was "entirely speculative whether the prior offense had a sexual motive." As we explained ante, however, the trial court did not abuse its discretion in finding the alleged conduct qualified as a sexual offense. The "sexual motive" was apparent from the video and the prior did not introduce a sexual motive where one was not otherwise obvious to the jury.

Second, defendant argues the alleged conduct was too remote because it had occurred more than 10 years prior and when defendant was a juvenile. " 'No specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible.' " (*People v. Robertson* (2012) 208 Cal.App.4th 965, 992.) "Numerous cases have upheld admission pursuant to Evidence Code section 1108 of prior sexual crimes that occurred decades before the current offenses." (*Ibid.; see People v. Waples* (2000) 79 Cal.App.4th 1389, 1395 ["20 years is not too remote" under sections 1108 and 352].)

The 11-year gap between the prior alleged sexual offense and Brandow's murder did not significantly reduce the probative value of the prior conduct evidence. As the trial court explained, defendant had been incarcerated the majority of the 11 years and had been released from prison for less than a year when Brandow's murder occurred. Further, while defendant's remoteness argument relied on general concepts of differences between cognition in juveniles and adults, he presented no evidence to show that he was a different person. Indeed, in his confession, defendant analogized Brandow's attack to the New York attack in which E. B. suffered significant injuries. He has pointed us to no evidence from which we can conclude the trial court abused its discretion in finding that the fact pattern in defendant's case suggested he was not a very different person as a juvenile than when he was charged as an adult.

Third, the uncharged sexual offense evidence introduced at trial was not unduly prejudicial. When determining the prejudicial impact of other sexual offenses admitted under section 1108, the trial court may consider the "nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from

their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*People v. Falsetta, supra*, 21 Cal.4th at p. 917.)

The record shows the trial court appropriately limited the scope of the evidence the prosecution proposed to introduce. The testimony and video evidence concerning the incident consumed a relatively small portion of the trial. In fact, E. B.'s testimony took approximately eight minutes and Detective Ulan's testimony took approximately 18 minutes. The five-minute video was played during Detective Ulan's testimony. None of

the testimony was duplicative and the court appropriately sustained defendant's objection to Detective Ulan's narration of the video and instructed the jury the "video speaks for itself." The evidence from the New York attack was also "less inflammatory than the evidence about the" Brandow murder (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1099), which "limits the evidence's prejudicial effect" (*People v. Daveggio and Michaud, supra*, 4 Cal.5th at p. 826).

Nothing in the record suggests the jury was inclined to punish defendant for committing the prior alleged sexual offense instead of, or in addition to, the charged offense, or that the jury was otherwise confused by that evidence. Indeed, the jury found defendant not guilty of the charged sex crimes and found the sex-crime-murder special circumstance allegations not true.

Defendant argues the evidence was prejudicial because defendant "testified that his intent in the prior was to commit robbery in order to defend himself from the allegation of a sexual motive." But, as the People appropriately note, "[h]ow [defendant] chose to defend against the uncharged offense was not known to the judge at the time he made his ruling and, thus, does not establish an abuse of discretion."

Finding no merit in any of defendant's arguments, we conclude the trial court did not abuse its discretion in ruling the prior alleged sexual offense admissible under section 1108.

Lodged Doc. 12 (ECF No. 14-13) at 12-14.

   D.  Objective Unreasonableness Under § 2254(d)

The appellate court resolved petitioner's claim exclusively as a matter of admissibility under California law.  The state court's resolution of that issue—and all subsidiary state law issues—is binding on this court.  See Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

21

To the extent that the state court implicitly rejected petitioner's corollary federal constitutional arguments, AEDPA bars relief because the United States Supreme Court has never held that the admission of propensity evidence, uncharged misconduct evidence, or any other type of prejudicial evidence violates due process.  Where the Supreme Court has not expressly announced the specific constitutional rule on which a petitioner relies for relief, there can be no unreasonable application of clearly established federal law and habeas relief is therefore unavailable.  Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (per curiam).  For this reason, the Ninth Circuit has repeatedly rejected § 2254 claims based on the admission of prejudicial evidence.  See Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); Alberni v. McDaniel, 458 F.3d 860, 866 (9th Cir. 2006), cert. denied, 549 U.S. 1287 (2007); Mejia v. Garcia, 534 F.3d 1036, 1047 (9th Cir. 2008).

In Mejia, the Ninth Circuit rejected a habeas claim that the admission of uncharged sexual misconduct under Cal. Evid. Code sections 1108 and 352 violated due process.  Mejia, 534 F.3d at 1046-47.  The court found that no clearly established federal law supports such a challenge to § 1108 evidence.  Id.  That holding is binding here.  Habeas relief is unavailable on this claim.

IV.    Claim Four: Prosecutorial Misconduct

A.  Petitioner's Allegations and Pertinent State Court Record

Petitioner alleges that the prosecutor committed misconduct in closing argument by quoting out of context a line from Berger v. United States, 295 U.S. 78 (1935).  In Berger, the U.S. Supreme Court noted the role of the prosecutor as "the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer."  295 U.S. at 88.  In the passage containing that line, the Court was emphasizing the duty of the prosecution to seek justice rather than merely secure victories.  The Court extolled the criminal justice system's twin goals of securing just convictions while preventing the wrongful conviction of innocents.  Id.  During closing argument in petitioner's case, the prosecutor quoted the phrase about the twofold aim of justice to suggest that the jury's twofold job was to ensure that the guilty defendant not escape conviction and to vindicate the innocence of the victim.  3 RT 627, 628 (ECF No. 14-7 at 31, 32).  Petitioner alleges that the prosecutor "intentionally misled the jury by placing the authority of the

1    United States Supreme Court behind her argument[,]" and improperly "denigrat[ed] the

2    presumption of innocence."    ECF No. 1 at 66.[7]

3         Acknowledging the unlikelihood that this alleged error changed the outcome of the trial,

4    petitioner alleges that that the cumulative effect of this and the other identified errors undermines

5    the validity of the verdict.  Id. at 67.

6              B.  The Clearly Established Federal Law

7         In reviewing prosecutorial misconduct claims, "[t]he relevant question is whether the

8    prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a

9    denial of due process."  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotations

10   omitted).  "To constitute a due process violation, the prosecutorial misconduct must be of

11   sufficient significance to result in the denial of the defendant's right to a fair trial."  Greer v.

12   Miller, 483 U.S. 756, 765 (1987).  "[T]he touchstone of due process analysis in cases of alleged

13   prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  Smith

14   v. Phillips, 455 U.S. 209, 219 (1982).  "[I]t is not enough that the prosecutor's remarks were

15   undesirable or even universally condemned."  Darden, 477 U.S. at 181.

16        The combined effect of multiple trial court errors violates due process when it renders the

17   resulting criminal trial fundamentally unfair.  Chambers v. Mississippi, 410 U.S. 284, 298, 302-

18   303 (1973).  The cumulative effect of multiple errors can violate due process even when no single

19   error rises to the level of a constitutional violation.  Id. at 290 n.3.

20              C.  The State Court's Ruling

21        The state appellate court ruled as follows:

22             Defendant argues the prosecutor committed prosecutorial
             misconduct by misleading the jury about the law during closing
23           argument when she misquoted a United States Supreme Court
             opinion as support for her argument. The People argue defendant
24           forfeited the argument by failing to object to the prosecutor's
             closing argument. The People further argue no prosecutorial
25           misconduct occurred because, while the prosecutor misinterpreted
             the United States Supreme Court opinion, "there is no indication
26

---

27   [7]  The attachments to the petition omit some pages of Appellant's Opening Brief, which is
     incorporated by reference, including some of the discussion of this issue.  The complete brief is
28   Lodged Document 9, filed at ECF No. 14-10.

that [the prosecutor] was intentionally trying to mislead the jurors."

"The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.] As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion -- and on the same ground -- the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.] Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) "It is a fundamental principle that reversal for prosecutorial misconduct is not required unless the defendant can show that he has suffered prejudice." (*People v. Uribe* (2011) 199 Cal.App.4th 836, 873.)

Defendant acknowledges "[i]t is admittedly unlikely that this error alone changes the outcome of the trial, but it may have a cumulative effect with the other [alleged] errors" addressed ante. In this vein, defendant makes no showing, nor does he attempt to show, he suffered prejudice from the alleged prosecutorial misconduct. We need not, therefore, consider whether prosecutorial misconduct occurred because, in the absence of a showing of prejudice, defendant's request for reversal cannot be granted. There can be no "cumulative effect" with regard to the other alleged errors either because we have found no merit in defendant's other arguments.

Lodged Doc. 12 (ECF No. 14-13) at 21-22.

### D. Objective Unreasonableness Under § 2254(d)

The state court correctly identified the clearly established federal law governing prosecutorial misconduct. It was perfectly reasonable to summarily reject petitioner's claim on the ground that he had made no showing of prejudice. There can be no due process violation without fundamental unfairness infecting the trial as a whole. Petitioner has identified no such unfairness, and none appears from the record. Moreover, the court is unaware of any U.S. Supreme Court authority finding due process violated by comments even remotely analogous to those presented here.

It was similarly reasonable of the state court to reject the cumulative error claim for lack

24

of error to cumulate.  Relief is not available on this claim.

<div align="center">CONCLUSION</div>

IT IS HEREBY ORDERED that the Clerk of Court shall update the docket to reflect the substitution of James Hill as Respondent.  See n.1, supra.

IT IS FURTHER RECOMMENDED, for the reasons explained above, that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  See 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 2, 2024

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

25